**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Molly Mulvey, | ) | Civil Action No. 2:08-3547-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| BellSouth Telecommunications, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Molly Mulvey originally filed this action on August 26, 2008 in the South Carolina

Court of Common Pleas, Charleston County.  This case was removed to federal court on October

20, 2008.   Plaintiff is a white female formerly employed by Defendant BellSouth

Telecommunications, Inc.  Plaintiff alleges race discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. This case is

before the court on Defendants' motion for summary judgment, which was filed on December 7,

2009. On January 10, 2010, Plaintiff responded to Defendant's motion for summary judgment.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, this matter was referred to

United States Magistrate Judge Bristow Marchant for pretrial handling.  On July 12, 2010, the

Magistrate Judge issued a Report and Recommendation recommending that Defendants' motion for

summary judgment be granted and that this case be dismissed.   On July 28, 2010, Plaintiff filed

objections to the Magistrate Judge's Report and Recommendation.

The Magistrate Judge makes only a recommendation to this court.  The recommendation has

no presumptive weight.  The responsibility for making a final determination remains with this court.

*Mathews v. Weber*, 423 U.S. 261, 270 (1976).  The court is charged with making a *de novo*

determination of any portions of the Report and Recommendation to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The court has considered the pleadings, motion, memoranda, deposition testimony, and other exhibits offered by the parties in support of their respective positions. The court concludes that Defendants' motion for summary judgment should be granted with respect to all of Plaintiff's claims.

## FACTS

Plaintiff began working as a Sales Associate in Defendant's Small Business Division on December 16, 2002. Pl. Aff. ¶ 3; Pl. Dep. at 27:11-13. Prior to taking any calls, Plaintiff completed a three month training period including training on company policies and procedures. Pl. Dep. at 27:16-25, 29:4-7. In addition, Defendant's Critical Customer Service Documents Checklist was covered with Plaintiff more than once during her employment. Pl. Dep. 29:20-30:21. Plaintiff's job duties included customer service, billing, and selling services such as DSL lines, mobile phones, long distance and international plans, and maintenance. Pl. Dep. 28:1-7. Plaintiff had six direct supervisors during her employment with Defendant: Pat Caldwell (White), Donna Caldwell (White), Kevin Gaylord (White), Richard Washington (African American), Stephanie Graham (African American), and Sabrina Rocha (Hispanic). Pl. Dep. 21-22.

Plaintiff was a member of the Communications Workers of America (CWA) union and was covered by its collective bargaining agreement. *See* Defendant BellSouth Telecommunications, Inc.'s Answers to Local Rule 26.03 Interrogatories at 1, Mulvey v. BellSouth Telecommunications, Inc., 2:08-3547 (D.S.C. 2008), ECF No. 8. Defendant had a progressive discipline policy that

included: counsel, warning, suspension (or letter in lieu of suspension), and termination. Zelaya Dep. at 13:23-25, 14:2-6; Wood Dep. 5:13-18. The severity of the step taken depends upon the severity of any misconduct that occurred. Zelaya Dep. 14:2-6. Defendant's human resources department consults with supervisors regarding any discipline at the warning level or above. Wood Dep. 5:7-10. One form of misconduct, "camping" is "when an employee or a sales associate . . . receives a phone call and they transfer [the] call to another department . . . and they don't release the call. Camping is considered gross customer abuse. . . ." Zelaya Dep. at 23:10-24:2.

Plaintiff's performance evaluation for 2003 indicates that Plaintiff satisfactorily performed her duties for that year. Pl. Ex. 9. On August 24, 2005, Plaintiff received a warning for "misconduct/failure to follow company policy" by her then-supervisor Richard Washington ("Washington"). Pl. Dep. at 32:5-20; Pl. Dep. Ex. 2. Specifically, in response to an email from a co-worker stating: "Why doesn't Richard fix his pants in the back?," Plaintiff responded "LOL." Pl. Dep. 32:24-34:23. Plaintiff was advised that continued misconduct would result in "further disciplinary action up to and including termination." Pl. Dep., Ex. 2. Although this email was sent to others and others responded, Plaintiff was the only employee involved, white or black, to receive a warning. Pl. Dep. 32:24-34:23. Plaintiff grieved this warning and it was agreed that if no other incidents occurred through December, the warning would be removed from Plaintiff's file. Pl. Dep. at 35:13-36:5. Plaintiff's performance evaluation for 2005 indicates that Plaintiff's performance was satisfactory. Pl. Ex. 9.

In 2006, Defendant merged with AT&T. Pl. Aff. ¶ 4. By the beginning of 2007, Stephanie Graham ("Graham") became Plaintiff's supervisor. *See* Pl. Dep. 36:23-24. Graham supervised the following individuals in addition to Plaintiff: Allen Harken (White), Scott Cave (White), Steve

3

Adams (White), Ivette Davis (African American), Alicia Maxwell (African American), Debra Kelly (African American), Pamela Bush (White), Tracy Lyssand (White), Patty Markley (White), Tricia Delice (African American), and Joy Simpson (African American). Pl. Dep. at 37:4-38:19.

On January 10, 2007, Graham discussed with Plaintiff "failure to follow instructions (using mandatory opening and closing statements)." Pl. Dep. Ex. 4. Plaintiff was advised that this was an informal discussion and that it would not go into her personnel record. *Id.* No discipline was issued as a result of this discussion. *Id.*; Pl. Dep. at 46:4-7. This was a new instruction given to everyone as a result of the merger with AT&T. Pl. Dep 44:4-8. That same day, Graham discussed with Plaintiff a "fail to handle" that took place on September 17, 2006 when Plaintiff added an international call block for a customer, but did not remove the international plan from the customer's account. Pl. Dep. 46:23-25, 47:22-25; Pl. Dep. Ex. 5. Plaintiff was not formally disciplined for this occurrence, but was advised that in the future she needed to "be sure of customer intentions." Pl. Dep 48:19-22; Pl. Dep. Ex. 5.

On February 8, 2007, Graham met with Plaintiff to discuss her performance in January 2007. Pl. Dep. 49:2-6. Graham commended Plaintiff for satisfactory "ABRL,"[1] attendance, adherence and "Crlft,"[2] but indicated that Plaintiff's overall performance was unsatisfactory. Pl. Dep. Ex. 6. Graham advised Plaintiff that future less than satisfactory reviews would result in disciplinary action and talked to Plaintiff about ways to improve. Pl. Dep. Ex. 6. Plaintiff indicated to Graham that she thought her evaluation was unfair because the past focus was on ABRL and she had "made her money." *Id.* Graham told Plaintiff she understood Plaintiff's concern, but that Plaintiff was not just

---

[1]    ABRL refers to a Sales Associate meeting his or her monetary goals. Pl. Dep. 50:2-4.

[2]    The record does not disclose the meaning of this term.

evaluated on ABRL" *Id.* On February 19, 2007, Plaintiff received an email that Graham sent to the whole team stating that management approval was required for all customer adjustments no matter how big or small. Pl. Dep. 52:16-20, Ex. 8. Plaintiff replied to Graham's email indicating that she understood. Pl. Dep. Ex. 8. On February 22, 2007, Graham met with Plaintiff to review her performance evaluation for 2006. Pl Dep. 51 :1-3, Pl. Dep. Ex. 7. Plaintiff's overall performance was evaluated at 99.18 percent, which was considered less than satisfactory.[3] Pl. Dep. Ex. 7. Plaintiff claims that she was given this unsatisfactory evaluation in spite of receiving satisfactory performance on all of her individual scores. Pl. Aff. ¶ 27. However, while Plaintiff received above 100% on three individual scores, she received only 68.98% on her ABRLite/Call score. Pl. Dep. Ex. 7.

On April 17, 2007, Graham received a "Center Process Analysis Team (CPAT) referral" from Atlanta indicating that Plaintiff was observed camping on a call. Pl. Dep. 56:8-24, 59:3-5. The CPAT referral states that Plaintiff transferred a call to avoid handling it, camped on the line for five minutes and fourteen seconds, and then hung up when the customer was advised to call Small Business. Pl. Dep. Ex. 9. Graham met with Plaintiff and a CWA representative that same day to listen to the call. Pl. Dep. Ex. 10. Plaintiff admitted that she transferred the call and then stayed on the line for a period of time while she inputted another customer's contract. Pl. Dep. 57:3-9; Pl. Dep. Ex. 10. Graham explained to Plaintiff that this was customer abuse because other customers were waiting and the customer on the line did not know she was listening in. Pl. Dep. Ex. 10. Plaintiff was informed that this was informal coverage for misconduct (camping), but that future

---

[3] Defendant's performance scale goes above one hundred and twenty percent with one hundred percent being the lowest satisfactory score.. *See* Pl. Dep. Ex. 7.

misconduct could result in disciplinary action up to and including termination. Pl. Dep. 58:19-24, Ex. 10. Plaintiff contends that Defendant's policy on camping had changed around this time and that she did not know her actions were misconduct when she performed them. Pl. Dep. 55:11-24. On April 20, 2007, then Center Director Kevin Gaylord ("Gaylord") had a meeting with Graham's team during which he went over expectations for sales associates including hold time threshold, camping, rude behavior and sales integrity. Pl. Dep. 60:16-20, 61:16-62:3; Pl. Dep. Ex. 11; Pl. Aff. ¶ 30.

In May of 2007, Plaintiff called Defendant's ethics hotline because she felt "that the Defendant was taking advantage of customers and consistently instructing employees to put on services that customers did not request to allow the Defendant to charge for services without authorization." Pl. Aff. ¶¶ 34, 36. Plaintiff also indicated that she was being discriminated against and harassed based on her race. Pl. Dep. 106:11-23. John Rimes called Plaintiff about her complaint, but then told her he had to pass it along. Pl. Dep. 107:4-7, 9-18. Lydia Wood handled Plaintiff's internal ethics complaint. Wood Dep. 4:25-5:2, 9:13-16. Wood interviewed Graham and two others, ultimately concluding that there was no reverse discrimination issue and closing the case. Wood Dep. 12:5-21. Wood states that her reason for this decision was that Defendant had recently reinstituted Summit II, which dealt with processes and procedures that were put into place for employees when they spoke with customers, and was "a bit of an adjustment" for people in Plaintiff's branch. Wood Dep. 13:1-23. Wood found that Summit II was being applied consistently across the branch and did not find that there was any racial group that was being treated differently from another. *Id.*

On May 8, 2007, Graham sent an email to her team regarding daily expectations including calling for coaching on demand ("CODs") for every new order. Pl. Dep. 64:7-11; Pl. Dep. Ex. 12.

Plaintiff replied to this email stating:

> Stephanie....  I don't mean to go against the grain at all but.... Calling cod's for me is something that I mentally don't do [because] I'm busy with the customer and overlapping etc...  I know I'm not above everyone else here but my nord is $154 as shown on my daily dollar...  I don't want to lost my job [because] I didn't call for one but at the same time I need my job and I feel as though I do a good job without someone sitting behind me [because] to tell you the truth it makes my skin crawl and that is why I strive to do a good job without being babysat....

> But again if I have to call then expect my sales to go down the drain [because] mentally I can't handle it....

Pl. Dep. Ex. 12.  Graham responded that Plaintiff needed to call for CODs.  Pl. Dep. Ex. 12.

Plaintiff indicated at deposition that supervisors and team leaders "never come" for CODs and when

they do, "they just sit there, text on their Blackberries"  and listen to the call.  Pl. Dep. 64:12-65.

On May 19, 2007, Graham was doing a side by side with Plaintiff when a customer called

to complain about services on his account that he did not want.  Pl. Dep. 68:1-19.  The customer

asked who he could talk to about this and Plaintiff stated: "you're in luck.  I happen to have a

supervisor sitting right with me."  Pl. Dep. 68:1-19.  Graham then turned her headset off and said:

"Don't offer my services."  Pl. Dep. 68:1-19.  Plaintiff sent an email to Graham and Graham's

supervisor to complain about this incident.  Pl. Dep. 69:4-15.

On May 20, 2007, Graham met with Plaintiff and a CWA representative regarding Plaintiff's

unwillingness to call for CODs and removal approvals, and Plaintiff's failure to use the contact pad.

Pl. Dep.  66:5-15; Pl. Dep. Ex. 13.  Plaintiff does not deny that she did not always call for CODs as

required by the May 8, 2007 email, but "called when [she] could." Pl. Dep. 66:16-20.  Graham told

Plaintiff that she needed to call for removal approvals and CODs in the future and must use the

contact pad.  Pl. Dep. 70:7-11.  Plaintiff received no formal discipline at this meeting.  Pl. Dep.

70:12-14; Pl. Dep. Ex. 13. Plaintiff believes that Graham's motivation for the May 20, 2007 meeting was to put Plaintiff in her place after emailing Graham's supervisor the day before. Pl. Dep. 69:16-17.

On June 5, 2007, Graham emailed her team a daily report of their statistics from the day before. Pl. Dep. Ex. 14. Plaintiff emailed Graham back to complain that she was only listed at 4% stating "So it means nothing that I'm 187% for the month?" Pl. Dep. Ex. 14. Graham responded that she was required to send a daily report and that she knew that the big picture means more than one day. *Id.*

On June 11, 2007, Graham received a referral from the CPAT team indicating that Plaintiff had been camping on a call for two minutes and eight seconds after transferring a customer to DSL technical support. Pl. Dep. 75:1-13; Pl. Dep. Ex. 16. Plaintiff used the time she camped on this call to work on an error on another customer's order to avoid a missed appointment. Pl. Dep. 75:17-77:6; Pl. Dep. Ex. 17; Pl. Aff. ¶ 37. Graham met with Plaintiff and a CWA representative, and advised Plaintiff that she should not clear errors at the expense of another customer. Pl. Dep. Ex. 16. Graham told Plaintiff that she should have told a supervisor she needed to work on this order so they could look for "closed key time" to clear the error. *Id.* Graham suspended Plaintiff for two days for misconduct, specifically customer abuse, as a result of this incident. Pl. Dep. At 77:16-21; Pl. Dep. Ex. 17, 18. When Plaintiff's CWA representative asked about the possibility of a "freebee," Graham indicated that Plaintiff could not have one because Plaintiff had received a "freebee" on her previous CPAT referral on April 17, 2007. Pl. Dep. Ex. 17. Plaintiff grieved her suspension to the union. Pl. Dep. 77:22-24.

At some point in June 2007, Plaintiff witnessed Joy Lynn Simpson ("Simpson"), an African

American Sales Associate, "escaping" discipline for failing to call for removal approval. Pl. Aff. ¶ 43. On June 24, 2006, Plaintiff witnessed Ivette Davis ("Davis"), another African American Sales Associate, state that she had not called for a removal approval. Pl. Aff. ¶ 42. Graham told Davis that it was okay this time, but that she must call for removal approvals in the future. *Id.*; Pl. Dep. 111:12-15. Plaintiff claims that Davis was not disciplined for this incident, but admitted at deposition that she does not know for sure. *Id.*; Pl. Dep. 86:10-87:23. That same day, Plaintiff complained to Graham that she felt she was being discriminated against and that African American employees were being treated more favorably. Pl. Aff. ¶ 44.

On June 25, 2007, Susan Isgro ("Isgro") did a side by side with Plaintiff and discussed with her the need to give a "parting shot" on all phone calls. Pl. Dep. 82:13-17; Pl. Dep. Ex. 21. On June 26, 2007, Graham did a side by side with Plaintiff during which Plaintiff cancelled, at the request of a customer, long-distance services on several of the customer's plans. Pl. Dep. Ex. 22. Graham noted that Plaintiff did not attempt to "minimize the loss to the company" and did not attempt to "find out if the customer had needs that could be filled by a plan that wasn't the cheapest possible long-distance plan." *Id.* Plaintiff claims that this side by side never occurred. Pl. Dep. 84:2-5. However, Plaintiff sent an email to Graham, Gaylord, and Isgro the night of June 26, 2007, which demonstrates the occurrence of the side by side. Pl. Dep. Ex. 40. Plaintiff's email states:

> Stephanie.... I don't have the name of the rep who was suppose to take out these toll free back in march... I forgot to write it down but you were listening to me at the time and you said you were going to inform her supervisor...
>
> I got to thinking that I shouldn't take the hit for the toll free's I took off of these accounts and I apologize [because] I can't fill the paperwork out for these [because] when I look... it was a customer service rep ydhbgcf [sic] who did the orders so I'm assuming this is an AE I remember her name was mary something.... I removed the long distance that the customer said he never asked for and I will not take the hit for

these but 2 toll free's on 4 accounts = 8 toll frees.... please help in this matter [because] again.... this was the one that you said you would talk to her supervisor....thanks....I believe the branch needs all the revenues it deserves...

And just to let you know as well ....I had to fill this out after I got off the phone [because] as I got to thinking about it .... this is a sales dispute...so I will put the ot sheet on your desk as I have signed out at 545.....thanks.[4]

*Id.*

On June 27, 2007, Graham had a meeting with Plaintiff regarding the overtime sheet. Pl. Dep. 85:22-86; Pl. Dep. Ex. 23. Graham told Plaintiff that she had to get overtime approved in advance and that she would be paid this time, but that the failure to get advance approval for overtime would be considered misconduct in the future. Pl. Dep. Ex. 23. Plaintiff agrees that she was supposed to get overtime approved in advance. Pl. Dep. 85:22-86. That same day, Graham met with Plaintiff and a CWA representative regarding Plaintiff's "refusal to call for removal approval." Pl. Dep. Ex. 25; Pl. Aff. ¶ 47. As a result, Plaintiff received a letter in lieu of suspension for misconduct. Pl. Dep. Ex. 25, 26, 27. Plaintiff became angry during a meeting and stated her belief that this discipline was related to the email she had sent to Graham's supervisor. Pl. Dep. Ex. 25; *see also* Pl. Aff. ¶ 48. After receiving her suspension, Plaintiff forwarded her June 26, 2007 email to Diane Cordina ("Cordina") of CWA with the following comment: "Fyi... this is what is sent last night that I'm sure prompted my 'in lieu of suspension' ...funny timing wouldn't you agree?" Pl. Dep. Ex. 40. On June 28, 2007, Plaintiff emailed Cordina to grieve her letter in lieu of suspension. Pl. Dep. 141:4-10; Pl. Dep. Ex. 39. Plaintiff's email states:

. . .

---

[4]     At deposition, Plaintiff claimed that the incident with her overtime occurred on May 20, 2007. Pl. Dep. 84:24-85:11. However, the date of this email demonstrates that Plaintiff was mistaken. Pl. Dep. Ex. 40.

I think it's kinda of [sic] funny that on Tuesday I stayed over to fill out a sales dispute and emailed my manager, the center director and the sales coach and explained the situation and mentioned that my overtime sheet was on Stephanie's desk to sign and the very next morning I have a "meeting" on my schedule bright and early at 9am. I was threatened in the meeting that the next time I fill out an overtime sheet for open overtime that I'll be charged with "misconduct" but that "she'll pay me this time." Please note that the email I sent the previous night was read by all three people as I have the read receipt on my email but not one person replied to my email.

. . .

I am claiming harassment again because if I have to call for removal approvals then the whole office has to... I am not going to stand and let this happen to me.

Pl. Dep. Ex. 39.

On July 13, 2007, Graham received a CPAT referral indicating that Plaintiff had misrepresented a price to a customer. Pl. Dep. 95:25–98:20; Pl. Dep. Ex. 28. Graham met with Plaintiff and a CWA representative to discuss the CPAT referral. Pl. Dep. Ex. 28. Plaintiff had told a customer that it was cheaper to have phone and fax lines on a package in Florida but "did not disclose NRC [non-recurring charges] even though customer would pay line connection charges and jack and wiring charges per the order." *Id.* Graham indicated that Plaintiff should have checked the exact rate and that by not doing so, Plaintiff had misrepresented the company. *Id.* Graham also advised Plaintiff that she had failed to properly read the equal access disclosure to the customer. *Id.* Plaintiff was suspended for five days without pay as a result of this incident. *Id.*

After her suspension, Plaintiff asked Gaylord to remove her from Graham's team. Pl. Dep. 101:5-11. Plaintiff was told that she had to wait and that Gaylord could not talk to her about it because "there will be lawyers involved." Pl. Dep. 101:12-16. Sabrina Rocha ("Rocha") then became Plaintiff's supervisor, which improved Plaintiff's work situation. Pl. Dep. 101:5-11, 127:2-

4. On July 23, 2007, Rocha met with Plaintiff and a CWA representative regarding a failure to handle a customer request. Pl. Dep. 102:19-24; Pl. Dep. Ex. 29. Plaintiff had referred a customer to another carrier to change her long distance. Pl. Dep. Ex. 29. Rocha explained to Plaintiff that when a customer calls, Plaintiff must handle their request regardless of the issue. *Id.* No formal discipline resulted from this incident. Pl. Dep. 103:16-17.

On July 27, 2007, Graham met with Plaintiff and Cordina to discuss Plaintiff's grievance of her July 13, 2007 suspension. Pl. Dep. Ex. 30. When questioned by Cordina as to the severity of the discipline, Graham indicated that it was because of Plaintiff's disciplinary history, specifically that she had already been suspended for previous misconduct. Pl. Dep. Ex. 31. Graham indicated at the meeting that Plaintiff's suspension would stand, but that Graham was willing to reduce the amount of time the incident would appear in Plaintiff's personnel file to eighteen months. *Id.* Plaintiff declined this offer and indicated that she would take her grievance to the next step. *Id.* That same day, Graham moved Plaintiff's desk causing her to lose all of her email and several sales. Pl. Aff. ¶ 52.

On September 19, 2007, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission (SCHAC).[5] Plaintiff's charge states:

I.      I am an employee of the Defendant. That during my employment with the Defendant I have been discriminated against based on my race. That other African American employees have been treated more favorably than white employees, including myself. That on two different occasions I have been disciplined for the same actions taken by African American employees who were not disciplined.

---

[5]      In South Carolina, charges of discrimination must first be filed with a local agency before being filed with the Equal Employment Opportunity Commission (EEOC) because South Carolina is a deferral state. *Nelson v. Lockheed Missiles and Space Co.*, No. 97-1430, 1997 WL 727609 at **1 n. 1 (4th Cir. November 24, 1997).

II.  That on June 24, 2007 I complained about the actions being taken against me and not other African American Employees. That in retaliation for my complaints, I was disciplined.

III.  That I have been discriminated against based on my Race in violation of South Carolina and Title VII laws. That I have been retaliated against in violation of South Carolina Law and Title VII laws.

Pl. Dep. Ex. 32. John Rimes was appointed by Defendant to investigate Plaintiff's charge of discrimination. Rimes Dep. 4:11-15. Rimes reviewed Plaintiff's personnel file, and interviewed Graham and then-Center Director Sandra De La Torre about the claims. Rimes Dep. 7:11-13; 8:21-25. Rimes then responded to Plaintiff's charge and submitted information to EEOC. Rimes Dep. 9:13-22.

On October 12, 2007, Rocha commended Plaintiff on the way she handled a particular customer call and made some suggestions for improvement. Pl. Dep. Ex. 33. On October 26, 2007, Rocha met with Plaintiff because Plaintiff was on a DN&N (new connect/disconnect) report. Pl. Dep. 128:9-129:24. Plaintiff had placed a new order for service when a customer was transferring an account into her name when Plaintiff should have done a "T of C" transfer. Pl. Dep. Ex. 34. As a result of Plaintiff's handling of the call, Plaintiff had received credit for a new order to which she was not entitled. *Id.* Rocha indicated that Plaintiff had had time to do the order correctly, and should have at least sent in a sales dispute to correct the transaction. *Id.* Plaintiff indicated that she had not intended to do anything wrong and that this was simply a mistake. *Id.* Plaintiff was terminated on October 26, 2007 for sales fraud as a result of the DN&N transaction. Pl. Dep. 130:2-12; Pl. Dep. Ex. 36.

On May 6, 2008, Plaintiff amended her charge of discrimination to add her termination. Pl.

Dep. 132:13-19, 133:4-6; Pl. Dep. Ex. 37. Plaintiff was notified of her right to sue by letter dated May 19, 2008. Pl Dep. 134:1-3; PL. Dep. Ex. 38.

**DISCUSSION**

**I.      Summary Judgment Standard**

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. Pro. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The*

*Community College of Baltimore*, No. 08-2023, 2009 WL 4643890, at *2 (4th Cir. Dec. 9, 2009).

## II.     Racial Discrimination

### A.     Introduction

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1).  In the absence of direct evidence of discrimination, Plaintiff may proceed under the McDonnell Douglas burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998).  Under this method, Plaintiff must first establish a prima facie case of discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). A prima facie case for a discrimination claim under Title VII requires a plaintiff to show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for her job and her performance was satisfactory; and (4) she was replaced by a member outside the protected class, or similarly situated employees outside the protected class were treated more favorably.  *Love-Lane v. Martin*, 355 F.3d 766, 787 (4th Cir. 2004); *Poteat v. PSC Automotive Group, Inc.*, No. 3:03CV129, 2006 WL 2828836, *3 (W.D.N.C. September 29, 2006) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).  There is no dispute for the purposes of summary judgment that Plaintiff established the first two elements.  However, the Magistrate Judge found that Plaintiff has not established the third and fourth elements of her prima facie case.

B.     Satisfactory Performance

Plaintiff contends that the Magistrate Judge erred in finding that Plaintiff has not presented evidence that she was satisfactorily performing her job.  Plaintiff contends: "[e]ach of the issues which the Plaintiff was disciplined for the Plaintiff can overcome with facts contrary."  Pl's Objection to Report and Recommendation at 4, Mulvey v. BellSouth Telecommunications, 2:08-3547 (D.S.C. 2008) ECF No. 29 (hereinafter "Pl. Obj."). The court disagrees.

The Magistrate Judge detailed the conduct that led to Plaintiff's two suspensions and letter in lieu of suspension, noting that Plaintiff does not deny the conduct that led to this discipline.  With regard to Plaintiff's first suspension, received on June 11, 2007 for camping on a call, Plaintiff does not deny that the event occurred, but contends that Graham refused to give her a "freebee," which Graham allegedly provided to other African American employees numerous times.  However, as Graham explained in the June 11, 2007 meeting, Plaintiff had already been warned about camping on calls on April 17, 2007 and received a "freebee" on that occasion.  In addition, Plaintiff does not provide evidence of which African American employees, if any, received more than one "freebee" for camping on a call.  Thus, there is no evidence that Plaintiff was treated differently than employees outside of the protected class with regard to her suspension for camping.

With regard to Plaintiff's June 27, 2007 letter in lieu of suspension for failure to call for removal approval, Plaintiff's objection alleges no facts indicating that this discipline was improper.  Plaintiff does not contend that she called for removal approval as required, but appears to believe that Graham disciplined her in retaliation for Plaintiff's June 26, 2007 email that Plaintiff sent to Gaylord and Isgro allegedly complaining about Graham.  However, Plaintiff's speculation on this point is not fact and cannot be relied upon to overcome summary judgment. *See Latif*, 2009 WL

4643890, at *2. Plaintiff's objection also does not state any facts to show that the five-day suspension she received on July 13, 2007 was inappropriate. Plaintiff does not dispute that she provided incorrect information to a customer about the cost of a service. With regard to Plaintiff's appearance on a new connect/disconnect report, Plaintiff does not contend that she performed her job correctly and admits that she made a mistake. Because Plaintiff does not contest that the occurrences that led to her receipt of formal discipline and to her termination took place, the court finds that Plaintiff has not shown that her job performance was satisfactory.[6]

C.    Racial Animus

Plaintiff objects to the Magistrate Judge's finding that Plaintiff has not provided evidence of racial animus to establish the fourth element of a prima facie case. As noted above, to establish this element, Plaintiff must provide evidence that similarly situated employees outside of her protected class were treated more favorably than Plaintiff. *Love-Lane*, 355 F.3d at 787. In making this showing, Plaintiff must demonstrate that comparators outside of her protected class are similar

---

[6]         Plaintiff makes numerous factual arguments that do not affect the court's analysis. Plaintiff contends that she never met with Graham on January 4, 2007 and never refused CWA representation as indicated by Graham's notes for that meeting. However, neither this court nor the Magistrate Judge considered the alleged January 4, 2007 meeting in making a determination. This was proper because the facts are to be construed in the light most favorable to Plaintiff. Plaintiff also contends that her less than satisfactory review for 2006 was inappropriate because "[i]n all areas contained in the graph the Plaintiff performed at or above the required numbers." Pl. Objection to Report and Recommendation at 5, Mulvey v. BellSouth Telecommunications, Inc., 2:08-3547 (D.S.C. 2008), ECF No. 29. This argument is disingenuous. Plaintiff's performance evaluation clearly shows that while Plaintiff had a score of over 100% on three of her four scores, her fourth score, for ABRLite/Call was only 68.98%. It is not unreasonable to give an employee an evaluation of less than satisfactory when an employee has significantly failed to meet expectations in a particular area.

Plaintiff argues that the January 10, 2007 and April 17, 2007 meetings should not be used against her because these counseling sessions were the result of new policies put in place after the merger. Assuming this to be accurate, the record, as discussed previously, indicates that Plaintiff has not shown her job performance to be satisfactory. Plaintiff also argues that it was unfair of Graham to discipline her on January 10, 2007 for failure to handle a call that occurred four months prior. The court disagrees. Plaintiff does not deny that the incident occurred. In addition, even without this failure to handle, Plaintiff has not shown that her performance was satisfactory.

to her in all relevant respects. *See Heyward v. Monroe*, 166 F.3d 332 (Table), 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998).

Plaintiff contends that on each occasion that she was disciplined, there were others who were disciplined differently. Plaintiff contends that on June 11, 2007 Graham refused to give Plaintiff a "freebee" that she gave to African American employees on numerous occasions. As was noted above, however, Plaintiff had already received a "freebee" for camping on a call on April 17, 2007. In addition, Plaintiff has submitted to the court no evidence that any African American employees received more than one "freebee" with regard to camping.

Plaintiff next contends that both Davis and Simpson "escaped" discipline after failing to call for removal approval while Plaintiff was disciplined. However, the record indicates that on May 20, 2007, Plaintiff met with Graham regarding her refusal to call for removal approvals and received no formal discipline, indicating that she received a "freebee" on this issue. Plaintiff does not provide evidence that Davis and Simpson received more than one "freebee" for failing to call for removals. In addition, Plaintiff has submitted no evidence indicating that Davis and Simpson were similarly situated to her in that they had disciplinary records similar to Plaintiff's. When an employee has a progressive disciplinary policy like Defendant's, discipline is tied to past misconduct. Therefore, under a progressive disciplinary policy, employees with different disciplinary records will often receive different punishments for the same misconduct based upon their past records. *See Mahomes v. Potter*, 590 F. Supp. 2d 775, 783 (D.S.C. 2008) (finding that a plaintiff was not similarly situated to a claimed comparator outside of the protected class even though the plaintiff's misconduct was similar to the comparator's because a progressive discipline policy was in place and the comparator

had no disciplinary record while the plaintiff did have a disciplinary record).[7]  Based on the

foregoing, there is no evidence that any of Plaintiff's alleged comparators was similarly situated to

Plaintiff such that Plaintiff can show that she was treated less favorably than those outside of her

protected class.[8]

Plaintiff has also submitted affidavits written by several former co-workers in support of her

motion for summary judgment.  *See* Pl. Exs. 2-5.  In one affidavit with an illegible signature, the

individual states that "[m]any African American employees were not punished as harshly as

Caucasian employees."  Pl. Ex. 5.  This individual indicates that people were singled out and

harassed until Defendant got rid of them, and that the majority of the people being singled out were

"of the Caucasian persuasion."  *Id.*  The unknown individual concludes that "[i]n my years of

working [for Defendant] I definitely witnessed unfair treatment of employees and much of it was

governed by skin color. . . ."  *Id.*  In another affidavit, Pamela Bush ("Bush"), a white female,

indicates that she worked for Defendant during the relevant time period and that she "witnessed

racial discrimination personally, targeted by . . . Stephanie Graham."  Pl.'s Response, Ex. 2.  Bush

states that several times she reported to Graham that she was having problems with her email and

headset, but that Graham did not take action to correct this and that Gaylord and her "Hispanic

female supervisor" took action.  *Id.*  Bush further indicates that Graham "targeted [her] by innuendo"

---

[7]     Plaintiff also contends in her affidavit that an African American employee, Fredress Brown ("Brown")
committed the same infraction for which Plaintiff was fired, but Brown was never disciplined.  Pl. Aff.
¶ 58.  Again, Plaintiff provides no evidence indicating that Brown had a similar disciplinary history
to Plaintiff's.

[8]     Plaintiff also contends that a meeting on June 8 for which Defendant provided evidence did not occur,
which Plaintiff also appears to argue is evidence of racial animus.  The court notes that Plaintiff
testified at deposition not that the meeting did not occur, but that she did not recall the meeting and
was not sure whether it occurred.  Pl. Dep. 73:3-15.  This meeting, at which Graham allegedly
discussed three issues, however, is irrelevant to the court's racial animus analysis.

by putting "personal entries in her record" and not allowing her "to a take a personal call from [her] son that could have been an emergency."  *Id.*  Joseph Dralle ("Dralle"), a white male, attests that he worked for Defendant "for over five years," but that he had heart problems and had to resign for his health because of the "hostile and racist atmosphere in our call center. . . ."  Pl's Response Ex. 3. Dralle attests that at one time during his employment he was suspended for five days for not disclosing an addition he made to an account, but that an unnamed African American co-worker who made a similar omission was only talked to.  *Id.*  Allen Harken ("Harken"), a white male, attests that he was employed by Defendant during the relevant time period.  Pl.'s Response, Ex. 4.  Harken states that he applied for and was qualified for a sales coach position, but that he was not properly interviewed and the position was awarded to Bridget Walker ("Walker"), an unqualified African American employee.  *Id.*

Plaintiff argues that the affidavits of her former co-workers constitute evidence that Plaintiff was treated less favorably than those outside of her protected class because the affidavits "clearly show that there was a racially charged atmosphere at the office."  Pl. Obj. at 7.  The court disagrees.

The Fourth Circuit has held that affidavits containing subjective beliefs of racial discrimination cannot create a genuine issue of material fact as to discriminatory conduct.  *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002).  The affidavits of Plaintiff's co-workers, as was noted by the Magistrate Judge, amount to no more than speculation that white employees were treated less favorably because of their race.  These affidavits provide no evidence in support of their allegations.  Specifically with regard to Harken's affidavit, the Magistrate Judge correctly noted that Harken's speculation that Walker received a job for which he was more qualified is not evidence of racial animus without information on both Harken and Walker's qualifications and

work history.  The Magistrate Judge properly discounted this affidavits in determining whether Plaintiff had submitted evidence of racial animus in this case.  The court finds that Plaintiff has not submitted evidence of racial animus to make out a prima facie case of racial discrimination.  There is no evidence in the record other than speculation that Graham was motivated by race in her treatment of Plaintiff.  Therefore, Plaintiff's race discrimination claim fails.[9]

## III.     Retaliation

Plaintiff objects to the Magistrate Judge's determination that Plaintiff failed to establish a prima facie case for retaliation due to a lack of causation contending that the Magistrate Judge "set forth the same arguments for failure to establish Retaliation."  Plaintiff contends that this is error and states that she "has presented evidence of differential treatment which establishes a racial animus."  Pl. Obj. at 7.  Plaintiff does not raise any specific objection to the Magistrate Judge's finding.  At most, Plaintiff's objection constitutes the type of general and conclusory objections that do not warrant the court's response.  *Orpiano v. Johnson*, 687 F.2d 44, 47-48 (4th Cir. 1982) (when a party makes only general and conclusory objections that do not direct the court to a specific error in the Magistrate Judge's proposed finding and recommendations, the court need not conduct a de novo review). Moreover, the court notes that evidence of racial animus is not an element of proof for a

---

[9]     Plaintiff also objects to the Magistrate Judge's observation that Plaintiff failed to provide the names of individuals that were treated more favorably than her contending that Davis and Simpson were identified.  It appears that Plaintiff has misread the Report and Recommendation.  The Magistrate Judge merely observed that in three of the four affidavits written by Plaintiff's co-workers claimed that African American employees were treated more favorably than white employees, but failed to name which African American employees to whom they referred.  The Magistrate Judge did not state that Plaintiff failed to identify which employees she thought were treated more favorably than white employees.

claim of retaliation.[10]

<h1 style="text-align:center">CONCLUSION</h1>

Based upon the foregoing, the court adopts the recommendation of the Magistrate Judge and incorporates it herein by reference. Defendant's Motion for Summary Judgment (Entry 21) is **granted**. Plaintiff's claims are dismissed with prejudice.

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
District Court Judge

September 20, 2010
Columbia, South Carolina

---

[10] A prima facie case of retaliation consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Munday v. Waste Management of North America, Inc.*, 126 F.3d 239, 242 (4th Cir. 1997).